# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHRIS J. JACOBS, III,

        Plaintiff,

     v.                         Case No. 08-C-0042

T. GERBER and C. BEERKIRCHER,

        Defendants.

# ORDER

The plaintiff, Chris Jacobs, is proceeding *in forma pauperis* on claims under 42 U.S.C. § 1983. In a decision and order dated August 5, 2009, U.S. District Judge Rudolph T. Randa granted summary judgment in favor of defendant P. Bartels.[1] The plaintiff's remaining claims are: (1) an access to the courts claim against defendants T. Gerber and C. Beerkircher; and (2) a legal mail claim against Gerber. The defendants have filed a motion for summary judgment on those claims, and the plaintiff has also filed a motion for order and motion for appointment of counsel. All of the pending motions are now before this court.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show . . . no genuine issue as to any material fact . . . and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] The plaintiff filed a Notice of Appeal of that decision and order, but the appeal was dismissed by the United States Court of Appeals for the Seventh Circuit for failure to pay the required docking fee.

56(c). The mere existence of some factual dispute does not defeat a summary judgment motion. Instead, "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,248 (1986) (emphasis in original). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), *Bethlehem Steel Corp v. Bush*, 918 F.2d 1323, 1326 (7th Cir. 1990). However, a court is "not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Isreal, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citing *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883, 886 (7th Cir. 1989)).

The moving party bears the initial burden of showing that there are no material facts in dispute and that he is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A defendant moving for summary judgment may satisfy this initial burden by pointing to the plaintiff's failure to introduce evidence sufficient to support the cause of action alleged. *Id.* at 325. Once the moving party meets its initial burden, the nonmoving party must "go beyond the pleadings" and designate specific facts to support its cause of action, showing a genuine issue for trial. *Id.* at 322-25.

-2-

When the moving party does not bear the burden of proof at trial, he can prevail on a motion for summary judgment by showing that there is an absence of evidence to support any essential element of the non-moving party's case. *Celotex Corp.*, 477 U.S. at 322-23. However, where the moving party bears the burden of proof at trial, he can prevail only by proving every element of his case with evidence so compelling that no reasonable jury could return a verdict for the non-moving party. *See Anderson*, 477 U.S. at 248; *Select Creations, Inc. v. Paliafito America, Inc.*, 911 F. Supp. 1130, 1149 (E.D. Wis. 1995).

## FACTUAL BACKGROUND[2]

At all times relevant to this case, the plaintiff has been a Wisconsin state prisoner housed at the Wisconsin Secure Program Facility (WSPF). Defendant Tracy Gerber (Gerber) is employed as a financial specialist at WSPF. Defendant Christine Beerkircher (Beerkircher) has Institution Complaint Examiner (ICE) duties as part of her employment at WSPF.

---

[2] Facts are taken from the Defendants' Proposed Findings of Fact, as well as the affidavits of the parties. The plaintiff's "Findings of Fact," which include his responses to the defendants' proposed findings of fact, as well as his own proposing findings, are not sworn. Nor do they reference affidavits or other evidence in the record. However, the plaintiff did submit a separate affidavit regarding his claims. The plaintiff's averments are frequently general and contain conclusory allegations; he also omits many important details. "It is well-settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (citing *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 [7th Cir. 1998]). Nevertheless, to the extent the plaintiff's affidavit contains relevant and admissible evidence, it has been considered. Facts are undisputed unless otherwise noted.

Case 2:08-cv-00042-JPS   Filed 03/29/10   Page 3 of 21   Document 104

# I.    PLAINTIFF'S USE OF INMATE COMPLAINT REVIEW SYSTEM (ICRS)

ICE duties are defined under Wisconsin Admin. Code Chapter 310.  In the course of her duties as an ICE, Beerkircher has reviewed ICRS offender complaints filed by the plaintiff.  She also screens complaints that inmates attempt to file with the ICRS, but that do not comply with § 310.09 filing requirements.  Pursuant to § DOC 310.09(3), the ICE shall return, and not process, complaints or submissions from prisoners that do not meet the requirements.  Beerkircher is not required to accept, date-stamp, or otherwise acknowledge submissions that fail to comply with § DOC 310.09.

The plaintiff insists both that his complaints were fine and that Beerkircher ignored his requests for help.  The plaintiff contends that complaints have not been returned to him.  He submits that Beerkircher just outright ignored the exceptions to the two complaints per week limit and refused to acknowledge his complaints at all.

Beerkircher has provided copies of the memoranda she sent the plaintiff regularly, returning complaint materials that did not comply with § DOC 310.09.[3] (Affidavit of Christine Beerkircher, Exhibit B).  Specifically, the plaintiff's offender complaints often contained more than one issue and/or failed to clearly identify the issue the plaintiff sought to raise.  The plaintiff also habitually tried to file more than

---

[3] The plaintiff avers that he submitted far more complaints than the numbers reflected in Beerkircher's memoranda returning complaints to him.  (Affidavit of Chris J. Jacobs, III, ¶1).  The plaintiff also swears that he filed a lot more complaints than were reflected in the exhibits to the affidavits submitted in support of the defendants' motion for summary judgment.

-4-

two non-exempt complaints per week, and he often attempted to submit complaints to the ICRS that were not on the proper form.

On May 11, 2007, Beerkircher noted that the plaintiff had submitted six complaints on the proper form that did not properly identify the claims presented and thirty-eight complaints that were not on the proper form. On May 18, 2007, Beerkircher returned thirty-eight complaints that were not on the proper form. On May 25, 2007, Beerkircher returned forty-three complaints that the plaintiff submitted on the incorrect form. On June 1, 2007, Beerkircher returned forty-five complaints the plaintiff had submitted on the incorrect form. On June 8, 2007, Beerkircher returned fifteen complaints the plaintiff had submitted on an incorrect form. On June 15, 2007, Beerkircher noted that the plaintiff had submitted fifteen complaints, but only three were on the proper form. On June 21, 2007, Beerkircher returned eight complaints for failure to identify one issue clearly and fourteen more that were not on the proper form. On June 29, 2007, Beerkircher returned twenty-eight complaints to the plaintiff that were not on the proper form.

This pattern continued for over a year, with Beerkircher returning numerous complaints to the plaintiff about once a week because they did not comply with § DOC 310.09, either because they were not on the proper form, they did not clearly identify only one issue, or because the plaintiff submitted far more than the two complaint per week limit for non-exempt complaints. In July 2007, Beerkircher returned at least sixteen complaints to the plaintiff. In August 2007, it was fifty-nine

complaints. In September 2007, it was sixty-one. In October 2007, Beerkircher returned a total of one hundred one complaints in seven different memos. In November 2007, Beerkircher returned sixty-one complaints to the plaintiff. Beerkircher returned thirty-seven complaints to the plaintiff in December 2007, forty-seven in January 2008, at least twenty-five in February 2008, thirty-four in March 2008, thirty-seven in April 2008, and forty-three in May 2008.

On March 6, 2007, the plaintiff received a memorandum from another ICE, Ms. Trumm, detailing the fifty-five complaints the plaintiff had submitted the previous week. (Affidavit of Christine Beerkircher, Exhibit D). Beginning the week of March 12, 2007, the plaintiff was limited to ten offender complaint forms per week. He was instructed to write to the ICE Office directly if he believed he needed more in a particular week. Then the ICE would review the complaints the plaintiff had submitted that week and determine if the plaintiff does in fact need additional forms. "This practice will continue until you cease abusing the Inmate Complaint System." *Id.*

On July 30, 2007, the plaintiff sent a letter to the Secretary of the Wisconsin Department of Corrections, which Warden Peter Huibregtse answered in a memorandum to the plaintiff on August 28, 2007. (Affidavit of Christine Beerkircher, Exhibit E). The warden advised the plaintiff:

> You have continually submitted complaints on scrap paper, toilet paper, etc. This is inappropriate, as you have been told numerous times in the past. There is no administrative requirement that the ICE Office maintain these items. The complaints that you submit correctly are

-6-

addressed and maintained. Ms. Beerkircher delivers ten complaint forms to your cell every Monday and the ICE Office has been receiving your complaints in ICRS Envelopes. As such, I am certain you are not being denied forms or envelopes.

*Id.*

On September 11, 2007, Beerkircher advised the plaintiff: "You will not be getting your 10 DOC 400's this week as you have already submitted 13 for the week." (Affidavit of Christine Beerkircher, Exhibit F).

In the spring of 2008, the warden requested information from Beerkircher regarding the plaintiff's ICRS concerns. Beerkircher supplied the warden with information that he, in turn, included in his April 14, 2008 memo to the plaintiff. He wrote, in part:

I spoke with Ms. Beerkircher from the ICE office and she indicated that the ICE office has not denied you access to ICRS but rather has spent a phenomenal amount of time attempting to explain the process to you. On 03/06/07 you were sent a memo indicating that in that week (02/26 - 03/02) alone you submitted 55 complaints to the ICE. Wisconsin Administrative Code DOC 310.09(1)(e) outlines the provisions for filing complaints appropriately. Ms. Beerkircher reported that you still continue to submit between 10-20 complaints week, well in excess of the 2 that are allowed per DOC 310.09(2).

(Affidavit of Christine Beerkircher, Exhibit C).

Ellen Ray, an ICE at WSPF, is the custodian of the ICRS records at WSPF. She confirms in an affidavit that the plaintiff was confined at WSPF from March 20, 2002, through December 13, 2002, and that he returned to WSPF on October 13, 2005, and has remained there since that time. "While the plaintiff has been confined to WSPF, he has been one of the most active users of the ICRS." (Affidavit of Ellen

-7-

K. Ray, ¶6). He has filed over one hundred thirty offender complaints that were accepted.

## II.    PLAINTIFF'S LEGAL LOANS

The plaintiff signed Loan Repayment Agreements regarding his legal loans on December 24, 2006, March 25, 2008, and December 30, 2008. (Affidavit of Tracy L. Gerber, Exhibits I, J, and K). Each agreement acknowledges receipt of DOC 309 Internal Management Procedure 29, Legal Loans, and states:

- I understand that my legal loan balance may not exceed $200 per year and that this amount must cover all my litigation expenses for the year, except as provided in DOC 309 IMP 29.

- I understand any charges to my account under this procedure are loans.

- I understand this document and hereby agree to all of its terms.

- I also agree to repay any and all outstanding loans provided me under this policy.

- I understand that upon my release I remain obligated to repay this loan in full. No coercion, threat or duress was used to induce me to enter into or sign this agreement.

*Id.*

On February 23, 2007, Gerber advised the plaintiff in a memorandum that paper and postage supplied to him under his legal loan are not to be used for corresponding with any parties other than those listed in Wisconsin Administrative Code DOC § 309.51 (The parties listed are "courts, attorneys, parties in litigation, the inmate complaint review system under Ch. DOC 310 or the parole board."). Gerber

-8-

told the plaintiff that "[r]equests received utilizing 'legal correspondence' materials to correspond with staff, will be returned unanswered." (Affidavit of Tracy L. Gerber, Exhibit M).

On March 12, 2007, Gerber sent the plaintiff a lengthy memorandum regarding legal loans. This was in response to the plaintiff's complaints to the warden about being denied legal loan funds. Specifically, Gerber addressed why the plaintiff could not use legal loan funds for postage to Franciscan Skemp, Mayo Health System, the American Bar Association, the American Civil Liberties Union, or "Atty. John Doe." She concluded:

> Since February 1st, you have submitted each of these requests thirteen times and they have been disapproved thirteen times. You have been told thirteen times that the requests do not meet the criteria required to utilize legal loan funds. Your refusal to follow staff directives and orders is what led to the conduct report and ultimately the loss of your television. If you wish to correspond with these organizations, you may use your "Writing Materials" to do so.

(Affidavit of Tracy L. Gerber, Exhibit M, p. 3). With regard to the frequency of the plaintiff's requests for legal supplies, Gerber wrote:

> In regards to the denial of legal supplies, the Facility Section of DOC 309.51.01 states, "One request for legal supplies will be accepted per week. Multiple requests in the same week will be returned unprocessed." You routinely submit up to five requests for legal loan supplies in a week. Three requests were denied on February 20th. The denial read, "If you continue to submit multiple orders for the same week, none of the orders will be processed. It has been your refusal to follow the instructions given that has led to the denial of your legal supplies requests. If you wish to receive legal supplies, you will only submit one order per week.

(Affidavit of Tracy L. Gerber, Exhibit M, pp. 3-4).

On March 22, 2007, Gerber sent the plaintiff a memorandum about misuse of legal supplies. In addition to a discussion of who the plaintiff may correspond with using legal loan supplies and postage, Gerber warned:

> You have been told on numerous occasions that legal loan may not be used to correspond with the American Bar Association and the American Civil Liberties Union unless you provide the name of an attorney. The Business Office must be able to verify the attorney name and address before the request will be processed. You have even been found guilty of disobeying orders for continuing to submit the requests after you were ordered to stop. Today, the Business Office once again received a request for legal loan postage from you to correspond with the American Bar Association. **This is the last time you will be told. If you continue to use legal loan supplies for these inappropriate purposes, your legal loan will be revoked.** Please keep this information in mind when determining how to use the legal loan supplies you have received.

(Affidavit of Tracy L. Gerber, Exhibit M, p. 5) (Emphasis added). However, the plaintiff's abuse of the legal loan system did not cease. On April 2, 2007, Gerber sent the plaintiff a memorandum in which she noted that the plaintiff had submitted 127 disbursement requests that were eventually disapproved and returned to the plaintiff. "This is a huge waste of staff time and institution resources." (Affidavit of Tracy L. Gerber, Exhibit M, p. 6).

Nevertheless, soon thereafter, the plaintiff used legal correspondence paper, which is specially marked, to send requests to the Business Office. Gerber's April 26, 2007, memorandum to the plaintiff advised, in part:

> The Business Office has been receiving information requests from you on "legal correspondence" paper. **<u>This is the last time you will be told</u>**. If you continue to use legal loan supplies for these inappropriate purposes, your legal loan will be revoked. Please keep this information

in mind when determining how to use the legal loan supplies you have received.

(Affidavit of Tracy L. Gerber, Exhibit M, p. 7) (Emphasis in original).

On May 10, 2007, Gerber wrote to the plaintiff:

Throughout your incarceration you have accumulated $5,570.95 in debts and obligations ($2,003.77 Federal filing fees, $2,231.54 State filing fees, $90.00 Medical Co-pays, $169.75 Restitution, and $1,075.89 Legal loans). The legal loan amount includes charges to your account for legal correspondence supplies you had requested. Until all of the legal loans are paid in full, the supplies are not yours to do with as you please. They are to be used in accordance with DAI 309.51.01.

You have been told on numerous occasions that the legal correspondence materials supplied to you through legal loan are not to be used to correspond with staff. On April 26th you were sent a memorandum that warned. "The Business Office has been receiving information requests from you on 'legal correspondence' paper. **This is the last time you will be told**. If you continue to use legal loan supplies for these inappropriate purposes, your legal loan will be revoked. Please keep this information in mind when determining how to use the legal loan supplies you have received."

Today the Business Office has again received an information request written on legal correspondence materials. As such, your legal loan privileges are being suspended for thirty days. Only disbursement requests with documentation indicating a court ordered deadline within thirty days will be processed. All other requests will be returned.

(Affidavit of Tracy L. Gerber, Exhibit M, p. 8). Even after the suspension, the plaintiff did not conform his behavior to the legal loan procedures. On June 25, 2007, Gerber sent the plaintiff another memorandum and warned: "If you continue to use legal loan supplies for these inappropriate purposes, your legal loan will be suspended six months for the second offense." (Affidavit of Tracy L. Gerber, Exhibit

-11-

M, p. 9).  Three days later, on June 28, 2007, Gerber wrote the following to the

plaintiff:

> Throughout your incarceration you have accumulated $1,090.16 in debts and obligations related to Legal loans.  The amount includes charges to your account for legal correspondence supplies you had requested.  Until all of the legal loans are paid in full, the supplies are not yours to do with as you please.  They are to be used in accordance with DAI 309.51.01.
>
> You have been told on numerous occasions that the legal correspondence materials supplied to you through legal loan are not to be used to correspond with staff.  On May 10th your legal loan was suspended for 30 days for your continuous use of legal loan supplies for unauthorized purposes.  Your legal loan was reactivated on June 8th and by June 22nd you had once again begun using your legal loan supplies to correspond with your Unit Manager.  You utilized "legal correspondence" paper to submit information requests on June 22nd, 23rd, & 24th to U.M. Hable and on June 23rd to the Business Office.  On June 25th you were sent a memorandum warning you to not continue using the materials inappropriately.  Yet on June 27th you again used "legal correspondence" paper to contact U.M. Hable.
>
> As such, your legal loan privileges are being suspended for sixty days.  Only disbursement requests with documentation indicating a court ordered deadline within the sixty days will be processed.  All other requests will be denied.

(Affidavit of Tracy L. Gerber, Exhibit M, p. 10).

Gerber still had to address the issue with the plaintiff again in a memorandum

dated November 26, 2007:

> Throughout your incarceration you have accumulated $1,137.93 in debts and obligations related to Legal loans.  The amount includes charges to your account for legal correspondence supplies you had requested.  Until all of the legal loans are paid in full, the supplies are not yours to do with as you please.  They are to be used in accordance with DAI 309.51.01.

-12-

On May 10th your legal loan was suspended for 30 days for your continuous use of legal loan supplies for unauthorized purposes. Your legal loan was reactivated on June 8th and by June 22nd you had once again begun using your legal loan supplies to correspond with your Unit Manager. On June 28, your loan was once again suspended. This time the suspension was for 60 days until Aug 24th.

I received correspondence from you today on legal loan paper concerning the submittal of a certified trust account statement. I was also forwarded numerous information requests that you had submitted to your Unit Manager using legal loan paper. You have been told time and time again that the legal loan materials provided to you through legal loan are not to be used to correspond with staff and you have continually chose to do so anyway. As such, all legal loan privileges will now being suspended for 120 days, until March 26th, 2008. Only disbursement requests with documentation indicating a court ordered deadline within the 120 days will be processed. All other requests will be denied.

(Affidavit of Tracy L. Gerber, Exhibit M, p. 11).

Gerber's temporary suspension of the plaintiff's legal loan was in response to the plaintiff's abuse of the system; he continued to refuse to comply with regulations concerning the use of legal loan funded supplies. Despite these temporary suspensions, the plaintiff still had legal loan privileges available to him in the event he provided documentation of a court ordered deadline within the suspension period. Gerber's intent was to preserve institution resources and make sure the these limited resources were devoted only to the uses for which they were provided.

At some point in October 2007, the plaintiff requested that the WSPF Business Office provide him with legal loan resources to photocopy his entire institution medical file. The Business Office declined to provide such resources

-13-

without court documentation that this photocopying was a necessary litigation expense.

When the plaintiff has complied with applicable legal loan procedures, he has been able to access legal loan funds for postage, supplies, and photocopying.

## DISCUSSION

The defendants submit that they are entitled to summary judgment on the plaintiff's claims because: (1) defendant Beerkircher has not denied the plaintiff access to the courts in her dealings with the plaintiff regarding the ICRS; (2) defendant Gerber has not denied the plaintiff access to the courts by enforcing Wisconsin Department of Corrections regulations regarding legal loans. Gerber also asserts that she has never seized the plaintiff's outgoing legal mail or directed anyone else to do so. The defendants also note that the plaintiff seeks only injunctive relief and, due to his inability to succeed on the merits of his claims, he is not entitled to any injunctive relief.

The plaintiff argues that the defendants' motion for summary judgment should be denied because they pick and choose what they want the record to say and have refused to give the plaintiff access to "exculpatory" evidence. The plaintiff believes that such "exculpatory" evidence would allow him to rebut false statements and misleading records that the defendants have made. He further argues that the defendants refused to copy his motion for summary judgment and exhibits because he did not have enough money in his legal loan to cover it. The plaintiff concludes

-14-

that he has been repeatedly denied meaningful access to the courts and to the ICRS. He also notes that he been denied three adequate meals daily, copies of his medical records, and health care.

## I.  ACCESS TO THE COURTS

The court allowed the plaintiff to proceed on an access to the courts claim against Gerber and Beerkircher based on his allegations that they prevented him from filing documents in his pending cases, denied him legal materials, and restricted his use of the inmate complaint process.

The United States Court of Appeals for the Seventh Circuit recently outlined a prisoner's right to access the courts as follows:

> The First Amendment right to petition the government for redress of grievances includes the right of access to the courts. *Cal. Motor Transp. Co. v . Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1294 n.5 (7th Cir. 1996). "[P]ersons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes 'access of prisoners to the courts for the purpose of presenting their complaints.'" *Cruz*, 405 U.S. at 321, 92 S.Ct. 1079 (quoting *Johnson v. Avery*, 393 U.S. 483, 485, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)); *cf. Woodruff*, 542 F.3d at 561 (Posner, J., concurring) (emphasizing that the right to petition includes a *reasonable* right of access to the courts). While the right of access to the courts requires prison officials to provide prisoners with the necessary tools "to attack their sentences, directly or collaterally," and "to challenge the conditions of their confinement," *Lewis v. Casey*, 518 U.S. 343, 355, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), it is not an abstract, freestanding right to legal assistance, *id.* at 351, 116 S.Ct. 2174. A prisoner asserting a denial of access claim must show an "actual injury" in the form of interference with a "nonfrivolous legal claim." *Id.* at 353, 116 S.Ct. 2174. "In other words, the right of access to the court is tied to and limited by a prisoner's right to 'vindication for a separate and distinct right to seek judicial relief for some wrong.'"

*Lehn v. Holmes*, 364 F.3d 862, 865 (7th Cir. 2004) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)).

*Bridges v. Gilbert*, 557 F.3d 541, 553 (7th Cir. 2009).

The defendants present evidence regarding *Jacobs v. Frank, et al.*, Case No. 06-C-0338 (E.D. Wis.), which was dismissed on January 12, 2009, pursuant to Federal Rule of Civil Procedure 37(b), because the plaintiff failed to comply with an explicit direction to provide the defendants with a signed authorization. Judgment was entered the same day. The plaintiff does not aver that his legal loan suspension prevented him from providing the defendants with the authorization. Even if he did, the January 12, 2009 decision and order would undermine his assertion. Not only did the defendants in that case provide the plaintiff with an authorization to sign, it is apparent that the plaintiff had the ability to access the courts because he was able to file motions with the court instead of providing the authorization to the defendants, as directed. Thus, the court concludes that the suspensions of the plaintiff's legal loan did not result in "actual injury" in the form of interference with the plaintiff's claims in this case. The plaintiff chose not to provide the defendants with a signed authorization, as ordered by the court, and, as a result, his case was dismissed.[4]

The plaintiff argues that the suspensions of his legal loan resulted in his inability to file a timely notice of appeal in *Jacobs v. Frank*, Case No. 07-C-55 (E.D.

_____

[4] The plaintiff avers that Gerber refused the plaintiff's request, with supporting documents, so he could ask more interrogatories in Case No. 06-C-0338 and in other litigation, during his 120-day legal loan suspension. (Jacobs Aff., ¶64). However, no actual harm resulted from the plaintiff's inability to ask more interrogatories because the case was dismissed because the plaintiff failed to comply with a court order.

-16-

Wis.). The plaintiff avers that he sent the Notice of Appeal to the Business Office, but it was never sent and he was never billed for postage. The plaintiff sent another, untimely, Notice of Appeal on Mach 26, 2008, after his legal loan suspension was lifted. The Seventh Circuit dismissed the Notice of Appeal as untimely.

In Case No. 07-C-55, the plaintiff cannot show interference with a "nonfrivolous legal claim." *Lewis v. Casey*, 518 U.S. 343, 353 (1996). The court dismissed the plaintiff's complaint at screening for failure to state a claim. The plaintiff's complaint challenged Wisconsin's $200 a year legal loan limit, but the complaint was dismissed because Wisconsin is under no constitutional obligation to provide the plaintiff with any assistance in pursuing his civil litigation. *Lindell v. McCallum*, 352 F.3d 1107, 1111 (7th Cir. 2003). There is "no constitutional entitlement to subsidy" to prosecute civil lawsuits. *Lewis v. Sullivan*, 279 F.3d 526, 528 (7th Cir. 2002). Because the plaintiff's complaint was dismissed at screening for failure to state a claim, any appeal from that dismissal would be frivolous. *See Tolefree v. Cudahy*, 49 F.3d 1243, 1244 (7th Cir. 1995) ("In the ordinary case if the suit is frivolous the appeal from the dismissal of the suit will also be frivolous. In such cases it is improper for the district judge to grant to proceed *in forma pauperis* on appeal.").

The record indicates that, to the extent Gerber handled the plaintiff's notice of appeal in Case No. 07-C-55, she did not send it out because the plaintiff's legal loan privileges had been suspended. Prison officials are free to place conditions on the

-17-

receipt of the funds as they deem appropriate. Such policies and conditions do not violate the Constitution because the plaintiff is not entitled to unlimited free postage, *see Gaines v. Lane*, 790 F.2d 1299, 1308 (7th Cir. 1986), nor a subsidy to exercise his right to petition the government, *see Lewis v. Sullivan*, 279 F.3d 526, 528 (7th Cir. 2002).

The plaintiff also makes an averment about sending two letters in *Jacobs v. Raemisch*, Case No. 07-C-0306 (E.D. Wis.), one to the court and one to the Attorney General's office. The plaintiff submits that he sealed both letters when he mailed them, but the postage was $1.34 to the court and only $0.76 to the Assistant Attorney General. The plaintiff seems to be implying that something was removed from the envelope that was sent to the Attorney General, but he does not suggest what might have been removed from one of the envelopes or that any harm came from the discrepancy. (Jacobs Aff., ¶65). Once again, the plaintiff can show no harm in Case No. 07-C-0306 because it remains pending in this district, before Judge Randa.

Finally, the plaintiff avers that Gerber repeatedly refuses to copy exhibits for the plaintiff, in this case and in others. He swears that Gerber refused to copy his motion for summary judgment and exhibits in this case. (Jacobs Aff., ¶107). He also submits that she refused to make copies of his medical file. The plaintiff very generally states that he has had lawsuits dismissed because he cannot show proper exhaustion of administrative remedies. (Jacobs Aff., ¶17). However, he does not

-18-

include the case name(s), number(s), or the court(s) that dismissed the cases. The plaintiff argues that he showed court deadlines during his legal loan suspension, but his requests were still denied. (Jacobs Aff., ¶28). Again, he does not include the case name(s), number(s), or identify the court(s).

At this stage of the proceedings, the plaintiff must support his claims with more than conclusory allegations. "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in the lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (internal quotation marks and citations omitted).

The plaintiff has submitted no evidence regarding any case that he lost because the defendants denied him legal materials or restricted his use of the inmate complaint system. In order to prevail on an access to the courts claim, the plaintiff must prove that he lost one or more cases due to the deprivations he alleges. *See Pratt v. Tarr*, 464 F.3d 730, 733 (7th Cir. 2006). He has not done so. Consequently, the court concludes that no trier of fact could find that the plaintiff was denied access to the courts as a result of the defendants' actions.

## II. LEGAL MAIL

The plaintiff also was allowed to proceed on a First Amendment claim that Gerber seized his outgoing legal mail.[5] The defendants do not separately address this claim, but their brief and Gerber's affidavit include her involvement with the plaintiff's legal mail. The evidence in this record now indicates that the plaintiff's entire legal mail claim is related to the notice of appeal that was not sent to the Seventh Circuit in Case No. 07-C-55 because he submitted it to the Business Office for mailing while his legal loan was suspended. As such, this is more properly analyzed as a claim for denial of access to courts. As discussed above, the plaintiff is unable to prevail on that claim.

In any event, an isolated incident of mishandled mail is not a concern of constitutional magnitude. *Castillo v. Cook County Mail Room Dept.*, 990 F.2d 304, 306 (7th Cir. 1993); *Morgan v. Montanye*, 516 F.2d 1367, 1370-72 (2d Cir. 1975), cert. denied, 424 U.S. 973 (1976). The court concludes that no reasonable trier of fact could infer that this one instance of Gerber not mailing out a pleading because the plaintiff's legal loan was suspended is the kind of ongoing pattern of mail tampering which rises to the level of a constitutional violation. *See Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986); *Castillo*, 990 F.2d at 306.

---

[5] Prisoners have a limited liberty interest in their mail under the First and Fourteenth Amendments. *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974), overruled on other grounds by, *Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989).

**PLAINTIFF'S MOTIONS**

The plaintiff filed a motion for an order asking the court to lift his legal loan suspension, allow or sell supplies and postage to him, and/or make copies. He also filed a motion for appointment of counsel. Both motions are rendered moot by the court's grant of summary judgment in favor of the defendants.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment (Docket #59) be and the same is hereby **GRANTED**, and this action be and the same is hereby **DISMISSED** with prejudice together with costs as taxed by the Clerk of the Court.

**IT IS FURTHER ORDERED** that the plaintiff's motion for order (Docket #87) be and the same is hereby **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for appointment of counsel (Docket #93) is **DENIED AS MOOT**.

The clerk is directed to enter judgment accordingly

Dated at Milwaukee, Wisconsin, this 29th day of March, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-21-